**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LINDA A. COLROSS, | |
| Plaintiff, | |
| v. | Civil Action No. 19-14573 (ZNQ) (DEA) |
| JOHN IMPERATO *in personam,* and the recreational vessel MIDNIGHT RIDER II, its engines, tackle and appurtenances, etc., *in rem,* | OPINION |
| Defendants. | |

**QURAISHI, District Judge**

This is a personal injury suit within the Court's admiralty jurisdiction[1] arising out of a

boating accident which occurred on the navigable waters off the coast of Long Beach Island, New

Jersey.  On July 1, 2019, Linda A. Colross ("Plaintiff") filed this suit against John Imperato

("Defendant.") ("Compl." ECF No. 1.)  Shortly after, Plaintiff filed her amended complaint in

which she alleges Defendant negligently operated the vessel, violating several statutes regarding

the safe navigation of vessels and causing her injuries.  (*See generally* Am. Compl., ECF No. 8.)

A bench trial was held on February 15, March 1–2, and May 4, 2022.  Following the trial, the

parties submitted proposed findings of fact and conclusions of law to the Court.  (ECF Nos. 51,

52.)  The Court, having fully considered the testimonial, video, photographic, and documentary

evidence presented and admitted at trial, the arguments of counsel and the applicable law, makes

---

[1] *See* 28 U.S.C. § 1333.

the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure[2].

## I.     STIPULATED FACTS[3]

1. On July 15, 2017, the Plaintiff, Linda A. Colross, was a passenger aboard the vessel, MIDNIGHT.

2. Linda Colross was a paralegal at the time of the accident, but is now retired.

3. At the time of the accident Linda Colross and John Imperato were in a relationship.

4. At the time of the accident, MIDNIGHT was being operated on the navigable waters of the intracoastal waterway.

5. The Defendant, John Imperato, owned, managed, operated and otherwise controlled the subject vessel, MIDNIGHT.

6. On July 15, 2017, including Plaintiff and Defendant there were a total of 6 persons on the vessel.

7. The voyage originated from the Spray Beach Yacht Club on Long Beach Island, New Jersey, at around noon that day with the primary destination being Motts Creek Inn; the vessel was then to return to Spray Beach Yacht Club.

8. Visibility was virtually unlimited.

9. Linda Colross holds a New Jersey boating safety certificate, has boated from an early age, and owned her own boat.

10. The defendant did not see any vessel that could have created a wake.

11. Linda A. Colross was injured during the subject voyage.

---

[2] Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.")
[3] All stipulated facts are taken from the Final Pretrial Order. (*See* Final Pretrial Order, 2–3, ECF No. 24.)

12. David Wilkes, T. Sean Kelly, Jaclyn Ward, and Laurie Imperato were also passengers on the vessel on July 15, 2017.

## II. ISSUES FOR TRIAL

1. Whether Defendant is liable for the injuries Plaintiff suffered during the boating accident on July 15, 2017?

2. Whether Plaintiff is entitled to damages for the injuries suffered, and in what amount?

## III. FINDINGS OF FACT

### A. Defendant's boating experience

1. Defendant is a certified recreational boat operator who has been boating since around 1997. (Tr. 18:17-19; 23:1-12.)

2. Defendant is an experienced boater, and he frequently takes his boat out for operation. (Tr. 106:13-17.) The Court finds Defendant, for approximately the past twenty-three years, has operated his boat on average 150 to 200 hours a season. (*Id.*) Plaintiff also had boating experience and was familiar with boats. (Tr. 55:3-9). Plaintiff testified that she had a boating certificate, that she previously owned a boat, and even lived on a boat during some summer seasons as a child. (*Id.*)

3. Defendant is familiar with the waterways along Long Beach Island, the Intracoastal Waterway ("ICW"), and the Great Bay. (Tr. 107:6-11; Def.'s Proposed Findings of Fact and Conclusions of Law 2:10, ECF No. 52.) Defendant testified that he has navigated this path from Long Beach Island to the Great Bay where Mott Creek Inn is located for more than forty to fifty times over the years. (Tr. 107:7-10.)

**B. The July 15, 2017, Accident**

4. Prior to the July 15, 2017, accident, the parties were in a long-term relationship and took hundreds of trips together on Defendant's boat. (Tr. 106:13-17.)

5. On the date of the accident, July 15, 2017, Defendant planned to depart from Spray Beach Yacht Club in Long Beach Island and arrive at Motts Creek Inn for lunch with Plaintiff and others. (Tr. 79:15-18; Def.'s Proposed Findings of Fact and Conclusions of Law 2:9.) As highlighted in the stipulated facts, the other passengers present included: (1) David Wilkes, Plaintiff's son, (2) Laurie Imperato, Defendant's daughter, (3) Sean Kelly, a friend of David Wilkes and Laurie Imperato, and (4) Jacqueline Ward. (Pl.'s Proposed Findings of Fact and Conclusions of Law 3:13-15; 3:18, ECF No. 51.) At the time of the accident, Plaintiff was seated on the port cockpit seat. (Pl.'s Ex. 12; Pl.'s Proposed Findings of Fact and Conclusions of Law 3:17.)

6. Defendant navigated his boat on the ICW past the southern tip of Long Beach Island. (Tr. 110:1-5.) A nautical chart showed the water around the ICW has a width of at least 300 yards and depth ranging from twenty-five to forty-four feet. (Pl.'s Ex. 2A-C.)

7. Defendant was operating his boat at a speed between twenty-two through twenty-five miles per hour. (Tr. 115:19-21; Def.'s Proposed Findings of Fact and Conclusions of Law 3:16.)

8. Initially Plaintiff was not concerned with Defendant's navigation of the vessel, but she became concerned when the vessel began to head toward the shoals[4] and outside the channel. (Tr. 66:24-25; 67:6-9.) David Wilkes, a passenger and Plaintiff's son, credibly testified and corroborated Plaintiff's testimony here. (Tr. 81:18-19.) Wilkes testified that although he could not see directly in front of him, he could see the red channel marker,

---

[4] Plaintiff testified that a shoal was an area in the water where the sand builds up from the current. (Tr. 57:15-18.)

where it should have been on the right, and that MIDNIGHT was outside the channel. (Tr. 82:1-6.) Sean Kelly also credibly testified that Defendant was out of the channel. (Tr. 93:4-7.) In light of these testimonies and contrary to Defendant's testimony[5], the Court finds that Defendant was out of the channel.

9. After becoming concerned, approximately three times, Plaintiff verbally alerted Defendant that he was veering toward the shoal. (Tr. 57:21-22.) With each warning, Plaintiff became agitated. (Tr. 113:7-8.)

10. Defendant responded to the previous two warnings stating he had things under control and testifying that he was not concerned. (Tr. 113:1-3) However, by the time Plaintiff issued the third warning, Defendant became distracted and looked down at his GPS. (Tr. 113:9-12.) Defendant even testified that he began to doubt whether his navigational route was correct as a result of Plaintiff's repeated verbal warnings. (*Id.*)

11. As he did this, Defendant veered towards a channel marker which he did not see until the last minute because he was looking down at the GPS. (Tr. 58:10-25.) As Defendant was looking down at his GPS, he was again alerted by Plaintiff. (Tr. 59:23-25.) This time her warning was even louder, and she was quite literally yelling profanities at Defendant to notify him that he was out of the channel. (Tr. 93:13-16.) While Defendant continued to look down at the GPS, Plaintiff and other passengers noticed a fishing boat speedily approaching their direction. (Tr. 59:10-15; 83:1-6; 94:12-14.)

12. The fishing boat created a large wake. (Tr. 59:23-25; 60:8-13; 83:15-17.) The wake was about two to three feet high. (Tr. 83:18-19; Def.'s Proposed Findings of Fact and Conclusions of Law 5:34.) Seconds before hitting the wake Defendant looked up and away

---

[5] (Tr. 112:13-15; Pl.'s Proposed Findings of Fact and Conclusions of Law 6:56.)

from his GPS but it was too late, and Defendant did not have enough time to react or evade. (Tr. 113:18-22.)  As a result, Defendant did not see the wake causing the boat to collide with it and leading to the accident. (Tr. 120:14-18.)  Sean Kelly testified that the impact of the wake was forceful, knocking him down and aggravating his preexisting knee injury. (Tr. 96:16-25; 97:1-6.)  Plaintiff also landed on her tailbone as a result of the wake's impact. (Tr. 61:1-4.)  Plaintiff was immediately in pain from the impact. (Tr. 259:14-18.)

13. The time between when Defendant looked down at the GPS and when the accident occurred spanned seconds. (Tr. 95:7-10; Def.'s Proposed Findings of Fact and Conclusions of Law 4:26.)  The parties and witnesses all testified that between five to thirty seconds elapsed during this period. (Tr. 50:24-25; 68:8-11; 83:6; 95:9-12; 96:1-2.)

14. Prior to hitting the wake, Defendant did not initially reduce the boat's speed and continued to operate MIDNIGHT at the speed it had been traveling.  (Tr. 60:16-19;98:11-12.) However, after the boat hit the second wake, Defendant slowed down.  (Tr. 17:23-24; 86:18-20; 98:12-14.)  Defendant testified that he could have been convinced to slow down, but he did not.  (Tr. 17:20-25.)

## C. Plaintiff's injuries

### 1. Plaintiff's T9 compression fracture diagnosis

15. As a result of the accident, the Court finds Plaintiff suffered injuries.

16. In July of 2017, approximately a week following the accident, Plaintiff had an initial consultation with Dr. Natacha S. Falcon ("Dr. Falcon")[6].  (Tr. 156:2-4.)  Dr. Falcon, an internal spine specialist with approximately fifteen years of experience, primarily treats injuries related to cervical, thoracic, lumbar or any pain ailments. (Tr. 153:1-4;154:22-24.)

---

[6] Dr. Falcon appeared on behalf of Plaintiff.

Dr. Falcon, who is board certified in physical medicine and rehabilitation, is licensed to practice in New Jersey. (Tr. 153:8-10.)

17. Dr. Falcon testified that she diagnosed Plaintiff with a T9 (thoracic spinal vertebrae) compression fracture which resulted from the accident. (Pl.'s Ex. 24; Pl.'s Proposed Findings of Fact and Conclusions of Law 23:222.) Dr. Falcon testified that based upon her personal examination of Plaintiff, Plaintiff had pain on palpation over the area where she was diagnosed with a compression fracture. (Tr. 157:3-7.) Based on Dr. Falcon's testimony of Plaintiff's pain score and her recommendation of pain medication, Plaintiff experienced severe pain as a result of the accident. (Tr. 164:13-16.)

18. During a physical examination conducted by Dr. Kristen Radcliff, an orthopedic spine surgeon who Dr. Falcon referred Plaintiff, Dr. Falcon testified that Plaintiff was neurologically intact. (Tr. 172:12-13.) Relying on Dr. Radcliff's report, Dr. Falcon testified that Dr. Radcliff did not recommend surgery for Plaintiff's injuries based on his review of her imaging study and neurological exam. (Tr. 172:23-24.) Instead, Dr. Falcon testified that according to the report, Dr. Radcliff suggested Plaintiff wear a more significant brace given her injuries. (Tr. 172:19-23.) Dr. Falcon credibly testified that Dr. Radcliff's report recommended physical therapy[7], medications, and continued conservative care—but iterated that he did not recommend surgery. (Tr. 172:13-25.)

19. Based on the Court's review of Dr. Radcliff's report, Plaintiff did not have multiple rib fractures which would suggest an unstable injury. (Pl.s' Ex. 36.) Although Plaintiff has a questionable edema, there is no evidence of an unstable T9 fracture such as an edema in the posterior ligamentous complex. (*Id.*) In light of this diagnosis, Dr. Radcliff

---

[7] Plaintiff completed a four-week physical therapy course which she attended for approximately three times a week. (Tr. 184:24-25; 185:1-4.)

recommended the following to Plaintiff: (1) follow up in about two months, (2) light activity, (3) avoid boats, (4) avoid lifting more than fifteen pounds, and (5) avoid bending more than 90 degrees.  (*Id.*)

20. The Court finds Dr. Joseph W. Dryer ("Dr. Dryer")[8] credibly testified on Plaintiff's injuries.

21. Dr. Dryer is an orthopedic surgeon with over thirty years of experience. (Tr. 303:25; 304:3-5.)

22. Dr. Dryer, like Dr. Falcon, testified that Plaintiff's T9 compression fracture resulted from the July 15, 2017, boating accident.  (Tr. 325:5-9; Pl.'s Proposed Findings of Fact and Conclusions of Law 23:224.)

23. Dr. Dryer testified that the treatment Plaintiff underwent was successful. (Tr. 324:3.)  Dr. Dryer corroborates Dr. Falcon's testimony[9] that a brace is standard treatment for the type of injury Plaintiff suffered, though he noted it is not necessarily required.  (*Id.* 324:4-5.) Dr. Dryer testified that although Plaintiff was prescribed a brace, she never wore it. (*Id.* 324:7-8.)  Dr. Dryer testified that braces provide pain relief and a patient's refusal to wear a brace could be an indication they were not having much pain. (*Id.* 324:10-13.)

24. Like Dr. Radcliff's report indicated, Dr. Dryer testified that given Plaintiff's injury, surgery was not required.  (*Id.* 324:16-18.)  Specifically, Dr. Dryer testified surgery was not required neither at the time of the fracture nor will it be required in the future.  (*Id.*)

25. Based on his personal observations of Plaintiff, Dr. Dryer testified that Plaintiff has normal motor and neurological examination.   (Tr. 311:8; 311:19-21.)   During the motor examination, Dr. Dryer testified he examined Plaintiff's muscle strength in all four

---

[8] Dr. Dryer appeared on behalf of Defendant.
[9] Dr. Falcon's testimony was partially based on her interpretation of Dr. Radcliff's report on Plaintiff's injury.

extremities and found everything to be normal. (*Id.* 311:5-98.)  On Plaintiff's neurological examination, Dr. Dryer testified there was no evidence of nerve injury or damage as a result of the accident.  (*Id.*; Def.'s Proposed Findings of Fact and Conclusions of Law 6:43.) Although Dr. Dryer testified he believes Plaintiff had subjective rib pain, he nonetheless testified that objectively there was no nerve compression indicated on the MRI which correlates to rib pain. (Tr. 328:17-20.)

26. Plaintiff's rib pain was a typical symptom of a thoracic spinal injury because the two body parts are attached. (Tr. 329:2-4.)

27. Both Drs. Falcon and Dryer testified that Plaintiff's T9 compression fracture was healed. (Tr. 201:11-14; 316:11-15.)  Plaintiff also experienced vertebral height loss. (Tr. 319:22-25; 320:1.)  However, both Drs. Falcon and Dryer testified that there was some normalcy with Plaintiff's height, and Dr. Falcon even opined that the height loss was a normal part of healing from a compression fracture especially given Plaintiff's age. (*Id.* 203:19-21;320:1-5.)

   *2.  Plaintiff's kyphosis diagnosis*

28. Based on the evidence produced at trial, the Court is convinced Plaintiff developed a mild case of kyphosis from the injury.  Kyphosis is a forward posture which affects the curvature of the spine. (Tr. 193:14-17.)  Based on Dr. Falcon's observation of two MRIs from 2017 and 2020, it appears that Plaintiff developed kyphosis along with compression fracture. (Tr. 194:6-13.)  Dr. Falcon testified that although Plaintiff's kyphosis may have worsened, it was not so severe as to require spinal surgery. (*Id.* 194:14-18.)

29. Dr. Dryer also testified that kyphosis may be attributable to age, and does develop in individuals aged sixty and older, like Plaintiff. (Tr. 335:4-9.)  Dr. Dryer testified he

observed, based on the MRI, that Plaintiff may have developed mild kyphosis but that it was not excessive which could lead to pain.  (Tr. 335:15-22.)  Dr. Dryer noted that in Plaintiff's case her kyphosis will not worsen over time.  (Tr. 335:23-25.)  Dr. Dryer also credibly testified that the degree of kyphosis in Plaintiff is not sufficient to cause cervical pain.  (Tr. 336:20-23.)

    *3.   Plaintiff's cervical spine diagnosis*

30. Dr. Falcon treated Plaintiff for cervical neck pain.  (Tr. 188:5-8.)

31. Based on her observation, Dr. Falcon recommended an imaging study, MRI, and physical therapy for the cervical neck pain.  (*Id.* 188:6-9.)

32. Like Dr. Falcon, Dr. Dryer also reviewed the cervical spine MRI to render his opinion. (Tr. 320:9-12.)

33. In his examination, Dr. Dryer testified Plaintiff experienced some disc degeneration but that it was expected for someone of Plaintiff's age.  (Tr. 320:19-20.)  Dr. Dryer testified that in his examination of Plaintiff's MRI, he did not observe any trauma or injury from the accident.  (*Id.* 320:22-24.)  Dr. Dryer testified that in his medical opinion, based on the MRI and the physical exam, Plaintiff did not have a cervical injury resulting from the accident but instead from age.  (Tr. 321:2-11.)  Importantly unlike Dr. Dryer, Dr. Falcon did not affirmatively testify that Plaintiff's cervical pain is a result of injuries sustained during the accident.

**D.  Issues with Plaintiff's Credibility**

    *1.   Plaintiff's credibility as it relates to events on the date of the accident*

34. The Court does not find Plaintiff's testimony entirely credible as to the events that occurred on MIDNIGHT on the date of the accident.  Plaintiff testified that she had a sip or two of

a drink while on the boat.  (Tr. 67:15-16.)  However, Plaintiff's own witness Sean Kelly testified that there was more drinking on MIDNIGHT than Plaintiff testified about.  (Tr. 92:4-7.)

35. Another instance where the Court does not find Plaintiff to be credible relates to a prior deposition testimony in 2020.  During cross examination and the Court's inquiry, it was revealed that Plaintiff was questioned and testified that no one else had been injured in the past while Defendant had been driving his boat.  (Tr. 72:10-22.)  However, during trial, Plaintiff recanted her previous testimony and now testified that there was another accident where someone else was previously injured while on Defendant's boat.  (*Id.*; 73:7-10.)

   *2.  Plaintiff's credibility as it relates to her injuries*

36. Plaintiff consistently testified that the injuries she suffered from the accident significantly affected her movement, caused her extreme pain, and affected everyday activities.  (Tr. 221:1-7.)

37. Plaintiff testified, and credibly so, that she had severe pain immediately after the accident, had to take pain medication, and needed to go to the Urgent Care shortly after for treatment.  (Tr. 212:22-23.)  The Court finds Plaintiff's testimony here credible in light of Drs. Dryer and Falcon's testimonies on Plaintiff's pain and injuries.

38. Plaintiff also testified that she could barely walk, (Tr. 212: 22) that she was bedridden for three-months after the accident (Tr. 217:5-7), and that she could not perform basic tasks such as walking the dog, shopping, and performing chores around the house.  (Tr. 217:7-12.)  Plaintiff testified that she had difficulty sleeping and getting ready in the mornings for work because of the pain she suffered from the accident.  (Tr. 219:24-25.)  Plaintiff testified she had difficulties driving, and that she needed to do practice drives as a result of

the pain. (Tr. 220:16-18.) Plaintiff testified that "I'm getting to that point where I can't continue living with this"—referring to her pain and injuries. (Tr. 237:21-23.)

39. The Court finds Plaintiff's testimony incredulous and overexaggerated in light of objective evidence.

40. The testimonies of Drs. Dryer and Falcon undermine Plaintiff's credibility. Contrary to Plaintiff's testimony, Dr. Dryer credibly testified that Plaintiff had minimal functional limitation as a result of the 2017 boat accident. (Tr. 314:1-4.) This means Plaintiff can now engage in routine life activities including walking, swimming, exercising, and even going on a boat again. (Tr. 323:9-13.)

41. The Court also finds it noteworthy that Dr. Dryer affirmatively testified that in his opinion he does not see Plaintiff's injury prevents her from doing any activity. (Tr. 172:13-25.)

42. Like Dr. Dryer, the Court finds Dr. Falcon credibly testified that she does not recommend Plaintiff engage in activities like bungee jumping and high velocity impact activities. (Tr. 196:12-13.) Even so, Dr. Falcon testified that she wishes Plaintiff to engage in normal activities and return to functioning. (Tr. 196:11-16.) Noteworthy, was that absent from Dr. Falcon's testimony was an affirmative opinion that Plaintiff may never be able to engage in everyday activities.

43. Numerous videos and photographs of Plaintiff engaging in activities like dancing, walking, and travelling also undermine Plaintiff's credibility as to the severity of her injuries. (Def.'s Ex. 6-25.) The Court examined a video of Plaintiff at a wedding. (Def.'s Ex. 8.)   In the eight second video, another wedding guest twirls Plaintiff as she is on the dancefloor. (*Id.*) In several other videos at the wedding, Plaintiff is seen dancing and moving relatively freely. (Def.'s Ex. 6–10) Plaintiff is seen twirling, moving back and forth, and moving

side to side without any visible impediments which may indicate pain or an inability to engage in this activity. (*Id.*) The Court finds Plaintiff also does not appear to wince in pain, nor does she appear physically impaired in any of the videos depicting her dancing. (*Id.*) The Court finds, based on these videos, Plaintiff overstated and embellished her injuries and limitations.

44. Another thirty second video of Plaintiff dancing further convinces the Court that Plaintiff's injuries were not as severe as suggested. The video clearly depicts Plaintiff and others dancing at an outdoor party with a live band playing in the background. (Def.'s Ex. 15.) The Court also reviewed and found other videos of Plaintiff and others dancing, seemingly to the cupid shuffle, as credible evidence refuting Plaintiff's account of the severity of her injuries. (Def.'s Ex. 16–17.) Based on the video evidence alone, the Court is convinced that Plaintiff's injuries were not nearly as severe or an impediment as Plaintiff portrayed.

45. The Court examined a picture of Plaintiff walking her dog on the beach as early as November 26, 2017—only about four months following the accident. (Def.'s Ex. 14; Tr. 356:22-25.)

46. The parties also went on a two-week trip to Europe[10] with some friends in or around September of 2019. (Tr. 346:25.) During that trip, Defendant testified, and pictures showed the parties and other attendees went to various locations in Europe to explore. (Def.'s Exs. 19–25) The evidence shows the attendees, including Plaintiff, visited villages, vineyards, explored landscape, and engaged in tourist activities all of which Plaintiff fully participated and never complained of her injuries. (Tr. 347:8-20; 348:2-3) Further, on this trip, the Court examined pictures showing the parties on a boat. (Def.'s Exs. 27–28.)

---

[10] Defendant testified that he, Plaintiff, and friends spent ten days in Italy and around four days in Paris during the two-week Europe trip. (Tr. 347:8-20.)

Plaintiff's injuries did not prevent her from engaging in this wide range of activities while on this trip and was yet again another example of evidence rebutting Plaintiff's testimony of her injuries and limitations.

47. While it was not mentioned by the parties, the Court finds it striking that Plaintiff was able to board a plane to Europe for an extended period of time even with the injuries she suffered, further undermining Plaintiff's credibility on her account of her injuries and pain. Equally, Defendant testified that he and Plaintiff took several long car journeys together after the accident. (Tr. 342:10.) Among them was a ten-hour drive to Plaintiff's son's wedding and a few car trips to Florida. (*Id.* 342:10-14.) Defendant also credibly testified that during vacations with Plaintiff—taken after the accident—Plaintiff routinely spent time entering and exiting cars. (*Id.* 342:14-16.) Notably, there was neither testimony that Plaintiff complained of pain nor was she unable to sit and travel for extended time periods.

48. Plaintiff could also engage in other activities such as washing a car as evidenced from pictures the Court reviewed. (Def.'s Ex. 11.) In one picture, Plaintiff is seen standing over the car wiping the hood, and, in another picture, Plaintiff is seen slightly leaning forward wiping the front hood of the car. (Def.'s Exs. 11-12.)

49. Defendant further testified that Plaintiff did not regularly engage in some of the activities she alleged. (Tr. 344:25; 345:1-3; 345:5-10.) For example, Plaintiff testified that due to the accident she was not able to play golf as often as she used to and had not played since the accident. (Tr. 225:3-5.) However, Defendant testified that Plaintiff was not a regular golfer and had only golfed about six times during the course of their entire relationship. (Tr. 345:1-3.) Skiing is another example of Plaintiff overrepresenting an activity she previously engaged in. Plaintiff testified that she went on a ski trip every year in

Sugarbush, Vermont, and can no longer ski.  (Tr. 243:12-15.)   However, Defendant credibly testified that he did not know Plaintiff to regularly ski during the relationship, and, on the two ski trips he and Plaintiff were on, she never skied.  (Tr. 346:1-3.)

50. In Plaintiff's favor, Plaintiff's injuries initially affected some aspects of her daily life. Defendant even testified that immediately following the accident he assisted Plaintiff through a period of pain.  (Tr. 366:22-25.)  Defendant testified that he assisted Plaintiff with household chores, shopping, and dog walking.  (Tr. 366:24-25.)  Defendant credibly testified that he personally observed Plaintiff experience significant pain immediately after the MIDNIGHT hit the wake.  (Tr. 367:18-19.)

## IV.   CONCLUSIONS OF LAW

### A.  Liability

In a case involving a personal injury on a vessel in navigation on navigable waters of the United States, a Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1333. *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 (1982).  Admiralty jurisdiction is also invoked if "the actions giving rise to the alleged tort have the potential to disrupt maritime commerce and 'bear a significant relationship to traditional maritime activity.'"  *Olmo v. Atl. City Parasail, LLC*, Civ. No. 13-4923, 2016 WL 1704365, at *7 (D.N.J. Apr. 28, 2016) (citing *Sisson v. Ruby*, 497 U.S. 358, 364–66 (1990)).  "With admiralty jurisdiction comes the application of substantive admiralty law."  *East. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986); *see also Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 73 (3d Cir. 1996) (observing that "[s]ubstantive maritime law applies to a cause of action brought in admiralty").  In admiralty cases, federal admiralty law controls. *Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 132 (3d Cir. 2002). However, even so, state law may apply to supplement but not contravene the admiralty rule in

place. *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 206 (1996).[11]   Here, this Court has admiralty jurisdiction because the alleged tort occurred on a boat on the navigable waters off the coast of Long Beach Island, New Jersey, and the activity—recreational boat ride collision with the wake—bears a significant relationship to traditional maritime activity. *See Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 (1982) (concluding that a collision between two pleasure boats on navigable waters has the potential to disrupt maritime commerce because a collision between boats in an area with heavy commercial boat traffic would have a "substantial effect on maritime commerce.")

"Negligence in admiralty law is essentially coextensive with its common law counterpart, requiring: (1) [t]he existence of a duty required by law which obliges the person to conform to a certain standard of conduct; (2) [a] breach of that duty by engaging in conduct that falls below the applicable standard or norm; (3) a resulting loss or injury to the plaintiff; and (4) [a] reasonably close causal connection between the offending conduct and the resulting injury." *In re Frescati Shipping Co.*, 718 F.3d 184, 207 (3d Cir. 2013) (internal quotations omitted).

The element of duty is not in dispute by the parties, and it has been stipulated that Defendant owned, managed, operated, and otherwise controlled the subject vessel, MIDNIGHT. (*See* Final Pretrial Order, 2–3.) Unlike duty, the element of breach is contested and the subject of this suit. Breach exists under admiralty law "where there was a 'fail[ure] to exercise that caution and diligence which the circumstances demanded, and which prudent men ordinarily exercise.'" *In re Frescati Shipping Co.*, 718 F.3d at 211.   Similar to the ordinary negligence context, negligence in the admiralty context also requires "reasonable care under the particular circumstances." *Id.* "In admiralty, the particular duty required under any given circumstance can

---

[11] The Court need not apply New Jersey law because the Court interprets the parties' use and argument of admiralty law in their Proposed Findings of Fact and Conclusions of Law as a concession that admiralty law applies.

be gleaned from statute, custom, or 'the demands of reasonableness and prudence.'" *Id.* (citing *Pennsylvania R.R. v. S.S. Marie Leonhardt*, 202 F.Supp. 368, 375 (E.D.Pa. 1962), aff'd, 320 F.2d 262 (3d Cir. 1963)).

Two prominent set of rules governs safe navigation of a vessel on the waters in and around the United States: the Uniform Inland Navigational Rules (the "Inland Rules"), 33 C.F.R. § 83.01-83.38 and the International Regulations for Preventing Collisions at Sea (the "COLREGS"), 28 U.S.T. 3459, TIAS No. 8587, 1050 U.N.T.S. 16. The Inland Rules apply "to all vessels upon the inland waters of the United States, and to vessels of the United States on the Canadian waters of the Great Lakes to the extent that there is no conflict with Canadian law." 33 C.F.R. § 83.01. Here, the Court will apply the Inland Rules because it has been stipulated the accident occurred on MIDNIGHT, a vessel, traveling on the navigable waters of Long Beach Island in New Jersey which is within the United States. (*See* Final Pretrial Order, 2–3.)

The Inland Rules apply to prevent "all dangers of navigation and collision and to any special circumstances." 33 C.F.R. § 83.02. The rule has several requirements of the vessel operator including to: (1) comply with ordinary practice of seaman (Inland Rule 2) (33 C.F.R § 83.02), (2) maintain a proper lookout (Inland Rule 5) (33 C.F.R § 83.05), (3) maintain a safe speed (Inland Rule 6) (33 C.F.R § 83.06), (4) determine if risk of collision exists (Inland Rule 7) (33 C.F.R § 83.07), and (5) take action to avoid collision (Inland Rule 8) (33 C.F.R § 83.08).

Plaintiff contends that Defendant violated Inland Rule 2 because "based upon . . . defendant's own admission, he was distracted and was looking at his GPS, [and] he did [not] see the wake in sufficient time to reduce speed and alter his course." (Pl.'s Proposed Findings of Fact and Conclusions of Law 36:13.) Plaintiff argues Defendant knew he needed to take these actions for the safety of his vessel and passengers but failed to do so. (*Id.*) Defendant does not specifically

address this argument, but generally contends Plaintiff's distraction breached a reasonable duty she owed to Defendant, and thereby caused the injury.  (Def.'s Proposed Findings of Fact and Conclusions of Law 11:9-11.)  The Court agrees with Plaintiff.  Inland Rule 2 requires "good seamanship and prudent navigation" *Maritrans Operating Partners L.P. v. M/T Faith I*, 800 F. Supp. 133, 140 (D.N.J. 1992).  Here, Defendant admitted that he was distracted and was unable to evade the wake from the oncoming boat primarily because he was looking down at his GPS.  (Tr. 58:10-25.)   Testimonial evidence also revealed that Defendant maintained the same speed throughout the incident and only reduced his speed after he hit the wake—which was in no way prudent.  (Tr. 60:16-19; 98:11-12; 115:19-21.)  Therefore, the Court concludes Defendant violated Inland Rule 2.

Plaintiff contends Defendant failed to maintain a proper lookout because he was "so engaged with his GPS" that "he chose to continue to operate his vessel at [a] speed" rendering him unable large wake and the large vessel approaching despite warnings from Plaintiff.  (Pl.'s Proposed Findings of Fact and Conclusions of Law 36:15).  Plaintiff further contends that despite the warnings, Defendant failed to look up.  (*Id.*)  Defendant contends that he was keeping a proper lookout and only became distracted because of "[P]laintiff's undue distractions concerning alleged submerged shoaling."  (Def.'s Proposed Findings of Fact and Conclusions of Law 11:3.)  Again, the Court agrees with Plaintiff.  Inland Rule 5 requires "a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."  33 C.F.R. § 83.05.  Here, although the Court finds that Defendant was distracted, Defendant nonetheless should have maintained a proper lookout given the warnings from Plaintiff.  (Tr. 57:21-22; Tr. 113:1-8.)

Defendant failed to maintain a lookout by sight because he was looking down at his GPS for about thirty seconds and did not see the wake even as other parties alerted him. (Tr. 59:10-15; 83:1-6; 94:12-14; 95:7-10.) Defendant also failed to keep a proper lookout by hearing because he failed to heed Plaintiff's and other passenger's warnings regarding his operation of MIDNIGHT. (*Id.*) Defendant did not take all of the appropriate means to prevent the collision and maintain a proper lookout. Therefore, in light of the evidence adduced at trial, the Court concludes that Defendant failed to maintain a proper lookout in violation of Inland Rule 5.

Plaintiff also posits that Defendant violated Inland Rule 6 because he struck the wake at approximately twenty-two to twenty-five miles per hour, and had he reduced his speed, as Defendant admitted, he would have seen the wake and safely maneuvered away from the wake. (Pl.'s Proposed Findings of Fact and Conclusions of Law 37:17-18.) Although Plaintiff notes there is no speed limit requirement within the rule, she nonetheless contends Defendant's speed was excessive and that Defendant's admitted to this during trial. (*Id.* 37:18.) In response, Defendant summarily argues that he "was traveling a safe speed for the expected conditions." (Def.'s Proposed Findings of Fact and Conclusions of Law 11:2.) Here, as Plaintiff recognizes, although there is no speed limit requirement, the rule certainly requires a safe speed which will allow the vessel operator to take "proper and effective action to avoid collision and be stopped within a distance" to avoid dangerous conditions. 33 C.F.R. § 83.05. Given the speed Defendant was operating the vessel and his recognition that he had full control and could have slowed down the vessel but failed to, the Court concludes Defendant violated Inland Rule 6. (Tr. 17:20-25.)

Plaintiff argues Defendant is similarly in violation of Inland Rules 7 and 8 because Defendant was unaware of the fishing vessel and the wake, and he failed to appreciate the risk. (Pl.'s Proposed Findings of Fact and Conclusions of Law 37:17-18.) Plaintiff contends that the

fact a collision did not occur is irrelevant and the appreciation of the risk is sufficient to trigger Inland Rule 8. (*Id.* 38:22.) Plaintiff concludes that Defendant could have reduced his speed and disengaged from looking down at his GPS, but his failure to do so resulted in a violation of these Inland Rules. (*Id.* 38:23.) Defendant refutes this position and argues in two conclusory statements that "Defendant did not violate Rule 7" and "Defendant did not violate Rule 8." (Def.'s Proposed Findings of Fact and Conclusions of Law 11:4-5.) The Court concludes, as Plaintiff proposes, that Defendant violated both Inland Rules 7 and 8. First, Defendant failed to appreciate the risk of collision[12] because he did not see or appreciate the approaching vessel which created the large impactful wake. (Tr. 113:7-15; 120:14-18.) Second, Defendant did not take any action to evade the wake and only slowed down *after* MIDNIGHT hit the wake. (emphasis added.) (Tr. 17:23-24; 86:18-20; 98:12-14.) Also informative for the Court is that Defendant only rebuts the evidence and conclusions that he violated Inland Rules 7 and 8 with two conclusory statements, which the Court finds insufficient to rebut Plaintiff's position. Therefore, the Court concludes Defendant violated Inland Rules 7 and 8.

The violation of a statutory duty invokes the *Pennsylvania Rule*. *Hygrade Operators, Inc. v. TUG TAHCHEE*, 307 F. Supp. 2d 626, 630 (D.N.J. 2003). "Under that rule, a ship violating a statutory rule intended to prevent collisions bears the burden of proving not only that its actions might not have been one of the causes of the collision, or that its actions probably were not a cause of the collision, but that the vessel's actions could not have been a cause of the collision." *Id.* Here, the Court has not been convinced that Defendant did not cause the collision. Instead, Defendant's primary argument and testimony throughout the trial has been that he was distracted

---

[12] In determining if risk of collision exists the following considerations shall be among those taken into account:
(i) Such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change.
(ii) Such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range. 33 C.F.R. 83.07(d)

by Plaintiff—specifically that Plaintiff commented "with increased agitation" while he was operating the boat—and this caused the accident. However, the Court concludes this is unpersuasive to release Defendant from liability. Therefore, the *Pennsylvania Rule* applies, and Defendant has not met his burden of disproving his actions are not to blame for the collision.

"Questions of causation in admiralty are questions of fact." *In re Frescati Shipping Co., Ltd.*, 718 F.3d 184, 212 (3d Cir. 2013). "The purpose of requiring proximate cause is 'to limit the defendant's liability to the kinds of harms he risked by his negligent conduct.'" *Id.* (citing 1 Dan B. Dobbs et al., The Law of Torts § 198, at 681 (2d ed. 2011)). Proximate cause is concerned with the "appropriate scope of legal responsibility." *Id.* Proximate cause provides that a negligent defendant is liable for all generally foreseeable harm that may arise from his negligent conduct and to others. *Id.* Plaintiff contends the proximate cause of the accident was not her warning but was Defendant's action in reaction to that warning. (Pl.'s Proposed Findings of Fact and Conclusions of Law 42:38.) Defendant rejects this and argues the proximate cause of the injury was "[p]laintiff's repeated distractions." (Def.'s Proposed Findings of Fact and Conclusions of Law 12:11.) Here, although the Court certainly recognizes and appreciates that Plaintiff's repeated warnings may have distracted Defendant, the Court concludes—based entirely on the evidence from trial—that the ultimate cause of the accident was Defendant's failure to keep his eyes on the seas not Plaintiff's comments. (Tr. 113:71-15.) Therefore, Defendant is liable for Plaintiff's injuries.

## B. Damages

In the context of admiralty personal injury suits, "the plaintiff is entitled to an award of damages commensurate with the nature and extent of his injuries." *Evans v. United Arab Shipping*

*Co.*, 767 F. Supp. 1284, 1293 (D.N.J. 1991), aff'd sub nom. *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207 (3d Cir. 1993). A plaintiff is entitled to the following damages:

1) loss of earnings and any impairment of his earning capacity, past and future, based on life expectancy at the time of the injury and based upon the probable pecuniary loss reduced to its present net worth;

2) medical expenses, past and future;

3) redress for his physical injury including pain, suffering, mental anguish, discomfort and inconvenience and compensation for the physical and mental effects of the injury on his ability to engage in those activities which normally contribute to the enjoyment of life based on life expectancy at the time of the injury.

*Id.* (citing *Pfeifer v. Jones & Laughlin Steel Corp.*, 678 F.2d 453, 460 (3d Cir.1982)).

### 1. Medical Expenses

Plaintiff notes her medical lien and total medical expenses amount to $5,897.00. (Pl.'s Proposed Findings of Fact and Conclusions of Law 33:299; 44:45.) Defendant recommends Plaintiff's medical lien was $1,501.85. (Def.'s Proposed Findings of Fact and Conclusions of Law 7:52.) The Court concludes Plaintiff is entitled to damages for past medical expenses due to the July 15, 2017, accident. *Pfeifer*, 678 F.2d at 460. The evidence shows the cost of Plaintiff's medical lien total is $1,501.85. (Pl.s' Ex. 56.) Plaintiff has not presented any evidence of future medical expenses she might incur, and the Court will not speculate what that amount should be. Therefore, the Court finds Plaintiff is only entitled to past medical expenses in the amount of $1,501.85.

### 2. Pain and Suffering and Loss of Life's Enjoyment

Typically, damages for pain and suffering at admiralty have both a past and future aspect. *See* Thomas S. Schoenbaum, Admiralty & Maritime Law Section 5:8 (6th ed. 2018). Here, the Court has already found that Plaintiff has failed to establish that she presently experiences (or will

experience in the future) pain, anguish, discomfort, or inconvenience as a result of the incident. *See Infra* Part III (discussing Plaintiff's credibility as it relates to her injuries). Based on the totality of the record, the Court's examination of the evidence, and in light of the Court's finding that Plaintiff is not entirely credible as it relates to her account of her injuries, the Court does not find that Plaintiff will continue to experience future pain and suffering.

An award for Plaintiff's pain and suffering will therefore be based only on what she has already experienced, which includes the following: (1) a thoracic (T9) compression fracture for which she received pain medication, back brace, and conservative care, (2) kyphosis for which she received no treatment, (3) cervical neck pain for which she received therapy, and (4) pain which she suffered immediately after the accident and limited some of her daily activities. *See Infra* Part III (detailing Plaintiff's injuries and pain). The Court also finds Plaintiff's injuries credibly lasted for about three months which it rests on Plaintiff's own testimony that she returned to work within three months from the date of the injury and Dr. Falcon's testimony that Plaintiff's pain was improving by September of 2017. (Tr.175:14-16.) Pain and suffering damages "are not subject to precise management." *Associated Terminals of St. Bernard v. Potential Shipping HK Co.*, 324, F. Supp. 3d 808, 825 (E.D. La. 2018). "Any amount to be awarded . . . must necessarily depend to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation." *Hyde v. Chevron, U.S.A., Inc.*, 697 F.2d 614, 632 (5th Cir. 1983). Considering the nature, duration, and severity of Plaintiff's injuries, the Court concludes that an appropriate award for her garden variety past pain, suffering, mental anguish, discomfort, and inconvenience is $15,000.

3.   *Prejudgment and Post judgment Interest*

Plaintiff also requests prejudgment and post judgment interests. (Pl.'s Proposed Findings of Fact and Conclusions of Law 44:49-50.) Defendant did not opine on whether Plaintiff should be granted either prejudgment or post judgment interest. Relying on the law, the Court concludes Plaintiff is also entitled to both prejudgment and post judgment interests from July 15, 2017, through the date of the filing of this opinion. *Somarelf v. American Bureau of Shipping*, 720 F.Supp. 441, 454 (D.N.J. 1989); *Zurich Insurance Co. v. Pateman*, 692 F.Supp. 371, 380 (D.N.J. 1987). "Prejudgment interest 'serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress.'" *Evans v. United Arab Shipping Co. (S.A.G.)*, 790 F. Supp. 516, 520 (D.N.J. 1992), aff'd sub nom. *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207 (3d Cir. 1993) (citing *West Virginia v. United States*, 479 U.S. 305 (1987)). The prejudgment interest amount "shall only be applied to the economic damages awarded for loss of earnings and medical expenses and not to the non-economic damages awarded for pain and suffering." *Id.* A "plaintiff should be awarded prejudgment interest unless there are exceptional circumstances that would make such an award inequitable." *Id.*

To calculate the amount of prejudgment interest, the following should be utilized:

> First, this rate is easy to determine from the federal post-judgment interest rate charts following 28 U.S.C. § 1961. Second, the 52–week Treasury bill rate has been found by Congress and by the marketplace to be a suitable approximation of the available return for a typical risk-free investment; such a benchmark is a reasonable approximation of a risk-free investment available throughout the period in which the employer retained the employee's wages and benefits.

*O'Neill v. Sears Roebuck and Co.*, 108 F.Supp.2d 443, 445 (E.D.Pa. 2000) (quoting *Davis v. Rutgers Casualty Ins. Co.*, 964 F.Supp. 560, 576 (D.N.J. 1997)).

The post judgment interest statute, 28 U.S.C. § 1961(a), provides for the calculation as follows:

> Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of the fifty-two week United States Treasury bills settled immediately prior to the date of judgment.

*Le v. Univ. of Pennsylvania*, Civ. No. 99-1708, 2001 WL 849707, at *16 (E.D. Pa. July 13, 2001) (citing 28 U.S.C. § 1961(a)).

Utilizing that calculation, and the compounding interest annually, as § 1961(b) requires, the Court will award Plaintiff prejudgment interest in the amount of $232.79. The calculation follows: $1,501.85(1+(0.0296/1))^(4.94*1) - $1,501.85 = $232.79. The Court will also award Plaintiff post judgment interest in the amount of $0. This is in light of the fact the opinion and judgment are published on the same date and no days would have elapsed for purposes of the calculation.

## V.   CONCLUSION

For the reasons stated above, Plaintiff is awarded $1,501.85 for medical expenses, $15,000 for pain and suffering, prejudgment interest in the amount of $232.79 from July 15, 2017, through the date of filing this opinion applies to the economic damages for medical expenses, and a post judgment interest in the amount of $0. An appropriate Order and Judgment will follow.

Date: **June 28, 2022**

ZAHID N. QURAISHI
UNITED STATES DISTRICT JUDGE